FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.
★ OCT 11 2013 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
NEBRASKALAND, INC.,

                Plaintiff,

    - against -

SUNOCO, INC. (R&M), et al.

                Defendants.
------------------------------------------------------------- x

**MEMORANDUM OF DECISION**

10 CV 1091 (RJD) (CLP)

DEARIE, District Judge.

Plaintiff Nebraskaland, the operator of a fleet of delivery trucks, lost a tremendous amount of money in what it contends was a fraudulent scheme orchestrated by its faithless former employee, Diaram Kalicharan, with the help of Richard Finkelstein, a franchisee of defendant Sunoco, Inc. (R&M) ("Sunoco"), and Arshad Qazi, the manager of one of Finkelstein's Sunoco gas stations at 880 Garrison Street in the Bronx (the "Garrison station"). Nebraskaland claims that Kalicharan, with Finkelstein and Qazi's assistance, took most of the money Nebraskaland was entitled to receive as a discount off the purchase of fuel from the Garrison station.

Throughout the resulting lawsuit, Finkelstein and Qazi have hotly contested the allegation that they knowingly participated in Kalicharan's fraud. Kalicharan has denied that any fraud even took place. All three eventually settled with Nebraskaland without admitting liability. Thus the full details of this fraud are not known for certain, and perhaps never will be. But what is known is that a lot of Nebraskaland's money has vanished, and Nebraskaland wants Sunoco to make good.

Sunoco has moved for summary judgment, protesting that it had no contract with Nebraskaland, and is not responsible for the fraudulent acts (if any) of Finkelstein and Qazi under the applicable theories of agency law. Sunoco is correct that it is not answerable under a theory of actual authority. However, viewing the facts and evidence in the indulgent manner required by Rule 56, the Court is nevertheless constrained to deny the motion. Nebraskaland has marshaled sufficient facts to support the inference that Finkelstein and Qazi bound Sunoco to the per-gallon discount through their exercise of apparent authority.

## BACKGROUND

Although many of the details of the scheme remain obscured, its design was fairly simple. Nebraskaland was to receive a discount, initially valued at $1.05 (Sunoco Ex. N), off each gallon of fuel it purchased from the Garrison station. Nebraskaland received this per-gallon discount through a deduction applied on the monthly invoices for its Sunoco "SunTrak" credit card. That monthly invoice deduction left Nebraskaland vulnerable to fraud because, by submitting simple paperwork to the SunTrak card issuer, Finkelstein and Qazi could reduce the amount of the deduction, and thus increase their own revenue. The reduced deduction would show up on the monthly SunTrak invoice – but, at that time, Kalicharan was the primary person responsible for reviewing and approving payment of those invoices. (Sunoco Conforming R. 56.1 Statement ¶ 47, ECF No. 298). Opportunity knocked on graft's door.

Finkelstein and Qazi reduced the deduction on the SunTrak invoice – by about eighty cents, then by about forty-five cents (Sunoco Exs. O and P) – and tendered the balance of the per-gallon discount to Kalicharan in cash. Finkelstein claims ignorance of the scheme. (Finkelstein Dep. 154-55). Qazi claims that he simply followed Kalicharan's instructions to pay part of the discount in cash. (Qazi Dep. 91-92). We need not determine exactly who was

responsible to decide Sunoco's motion. Rather, Sunoco's motion hinges on the relationship between Sunoco, Finkelstein and Qazi, the operation of the SunTrak program, and the circumstances surrounding the negotiation of the per-gallon discount. Those facts, viewed in the light most favorable to Nebraskaland, are as follows.

Finkelstein is the principal of BBZZ Equities, Inc. ("BBZZ"), which owns the Garrison station and leases it to 880 Garrison Corporation. Qazi is President of 880 Garrison Corporation and manages the Garrison station. Finkelstein and Qazi operate the Garrison station pursuant to a Dealer Supply Franchise Agreement ("DSFA") between Sunoco and Finkelstein/BBZZ. (Sunoco Exs. B and C).[1] The DSFA includes several provisions in which Sunoco retains partial control over the operation of the Garrison station. These include provisions relating to the maintenance of Sunoco's brand and reputation; Sunoco's right of unrestricted access to the premises; minimum fuel sales requirements; signage, uniform, and on-site advertising requirements; a 24-hour schedule of operations; mandatory employee training programs; and Sunoco's authority to resolve certain customer complaints. (Nebraskaland R. 56.1 Statement ¶ 107, ECF No. 295). However, the DSFA also expressly disclaims any agency relationship between the parties, and specifically disavows Sunoco's control over other key areas of operation, including the pricing of fuel and retail products. (Sunoco Exs. B and C, at ¶ 3.05). No portion of the DSFA (or any other written agreement between Sunoco and Finkelstein that has been brought to the Court's attention) specifically addresses the franchisees' authority, if any, to bind Sunoco when arranging individual per-gallon discounts to be applied through the SunTrak program. (Nebraskaland Opp'n Br. 16).

---

[1] Two versions of the DSFA existed during the relevant time frame, but the differences between the two are not material to the Court's analysis.

So far as the Court can tell from the parties' submissions, Sunoco's actual day-to-day control over the Garrison station did not meaningfully depart from the terms of the DSFA, although Sunoco did take steps to ensure compliance with its terms.[2] For example, Sunoco sent "mystery shoppers" to anonymously patronize the Garrison station and report their findings to Sunoco. (Gray Dep. 71). As a result of these reports, Sunoco occasionally insisted on certain changes, demanding, for example, that Qazi modify bathroom signage. (Qazi Dep. 41-46). However, it does not appear that Sunoco ever undertook greater control of the Garrison station than that set forth in the DSFA. Nor is there any evidence that Sunoco dictated the pump prices at the Garrison station.

The per-gallon discount allegedly embezzled by Kalicharan is one of two discounts Nebraskaland was entitled to receive on its fuel purchases from the Garrison station. The other discount, which the Court will call the "fleet discount," was negotiated in late 2005 or early 2006, when Nebraskaland first signed up for the SunTrak program. (Romanoff Aff. ¶¶ 3-4.) Like the per-gallon discount, the fleet discount was not applied at the point-of-sale: Nebraskaland paid for fuel with its SunTrak credit card at the listed pump price, and then received the fleet discount of 3% on its SunTrak invoice. (Sunoco R. 56.1 Statement ¶ 21).

The SunTrak program was owned and administered by Citibank (South Dakota), N.A. ("Citibank"), pursuant to the terms of a Private Label Card Agreement between Sunoco and Citibank, later assigned to Wright Express Financial Services Corporation ("Wright Express") in

---

[2] Nebraskaland does not appear to dispute that premise, instead arguing that the controls Sunoco exercised pursuant to the DSFA are themselves sufficient to create a factual dispute on whether a principal-agent relationship existed between Sunoco and Finkelstein. Nebraskaland Opp'n Br. at 11-14.

4

March 2009. (Sunoco Ex. H); (Sunoco Ex. I).[3] Under the terms of the agreement, Citibank was responsible for processing payments and preparing customer invoices. (Sunoco Ex. H, at § 2.1). To ensure that customers received the correct per-gallon discount, Sunoco's franchisees would submit a form to Citibank – the so-called "SunTrak Merchant Discount Form" – that specified the fleet customer and the amount of the per-gallon discount. (Mattix Dep. 35-37); (Sunoco Ex. C). The Merchant Discount Form includes Sunoco's logo on the top, although it lists a Citibank address on the bottom. (Romanoff Aff. Ex. C).

Finkelstein originally marketed the SunTrak program to Nebraskaland, as was his practice when developing business for the Garrison station. (Finkelstein Dep. 21-22). Finkelstein did so because the Garrison station is located in the Hunts Point section of the Bronx, an industrial area where nearby trucking fleets form the majority of potential customers. (Finkelstein Dep. 21). Thus, to generate business, Finkelstein actively recruited these fleets, using promotional materials supplied by Sunoco. (Finkelstein Dep. 20-21); (Romanoff Aff. Ex. A). The promotional materials Sunoco supplied to Finkelstein included a sales brochure describing the SunTrak program, which is marked throughout with Sunoco's logo, and which instructs customers to sign up through "Sunoco Fleet Program Specialists" or through the "www.sunococreditcard.com" website, without mentioning Citibank. (Romanoff Aff. Ex. A). Sunoco's employee, John Mattix, occasionally accompanied Finkelstein when he made his pitch

---

[3] Nebraskaland contends that there is a dispute of fact over who "controlled" the SunTrak program. (Nebraskaland R. 56.1 Statement ¶ 22). However, the letter it relies upon, (Wolter Decl. Ex. A), which uses the word "administered," does not contradict the terms of the Private Label Card Agreement, and is therefore insufficient to create a genuine dispute of fact. Furthermore, as discussed more fully infra, p. 12-13, the Court's conclusion does not turn on the question of who controlled the SunTrak program, broadly defined – the relevant question is who prepared the specific Merchant Discount Forms used to facilitate the alleged fraud.

5

to potential customers, but did not participate in the meetings with Nebraskaland. (Mattix Dep. 93-95).

Finkelstein's sales pitch persuaded Nebraskaland, and it joined the SunTrak program. The company received an invoice for January 2009 that, as promised, included the 3% fleet discount, individually itemized as a deduction on the invoice. (Romanoff Aff. Ex. B). Like the SunTrak sales brochure, the invoice included Sunoco's logo and made no mention of Citibank. The invoice also specified that checks should be made payable to "Sunoco," and provided a return address at the "Sunoco Credit Card Center."

After Nebraskaland received this invoice, Finkelstein and Qazi returned and proposed the per-gallon discount. That discount, coupled with the already agreed fleet discount, induced Nebraskaland to use the Garrison station as its preferred fuel supplier in the Bronx. (Romanoff Aff. ¶ 8). Finkelstein and Qazi had been keeping the pump price artificially high, in order to discourage overuse by drivers paying with so-called "Comchecks," whose trucks blocked access to the pumps for long stretches of time, decreasing the station's revenue. (Qazi Dep. 153-57). Not wanting to pay that inflated price, Nebraskaland had been drawing fuel from other stations in the neighborhood, including an "Americo" branded station. (Romanoff Dep. 161-62). Thus, to undercut nearby stations, Qazi pegged Nebraskaland's per-gallon discount to the Americo station's pump price, less approximately two to four cents per gallon. (Qazi Dep. 83-84).

The per-gallon discount was confirmed at a March 2006 meeting between Finkelstein, Qazi, Kalicharan, and Richard Romanoff, Nebraskaland's president. There is little evidence detailing exactly what was said at that meeting. E-mails exchanged by Sunoco and Wright Express employees after the fraud was uncovered suggest that Finkelstein may have told Romanoff that Sunoco would reimburse the per-gallon discount: "[Talked to] Rich [Finkelstein]

– he said that the fleet [i.e. Nebraskaland] applied for the Sunoco account at 880 Garrison Ave – he said that the station had an agreement with the fleet that they would overcharge the fleet a $1 per gallon then Sunoco would later reimburse the $1." (Mattix Dep. 34-35); (Sunoco Ex. B).

There was no written contract signed by the parties at the meeting. However, after the meeting, on March 20, 2006, either Finkelstein or Qazi faxed a copy of the Merchant Discount Form to Nebraskaland. (Romanoff Aff. Ex. C). That Merchant Discount Form specified a $1.07 discount, and stated that the discount was "authorized by" Richard Finkelstein. Romanoff claims that he believed that Merchant Discount Form was itself a written contract. (Romanoff Aff. ¶ 8); (Romanoff Dep. 603-04).

Unlike the fleet discount, the per-gallon discount applied only to purchases at the Garrison station. (Romanoff Dep. 166). Qazi at first reimbursed a portion of the per-gallon discount with checks drawn on his corporate account. (Sunoco Ex. M). However, Nebraskaland wanted both discounts to be applied to the SunTrak invoices. Accordingly, when Romanoff learned from Kalicharan that Qazi had been reimbursing Nebraskaland with his own corporate checks, he insisted that the per-gallon discount, like the fleet discount, come directly off the SunTrak invoices. (Romanoff Dep. 396-98); (Qazi Dep. 78-79). Qazi obligingly submitted a Merchant Discount Form to Citibank designating an invoice deduction of $1.05, retroactive to January 16, 2006. (Sunoco Ex. N). However, to facilitate the scheme (according to Nebraskaland), Qazi later submitted new Merchant Discount Forms that reduced the invoice deduction, first setting the deduction at twenty-five cents per gallon, then sixty cents per gallon. (Sunoco Exs. O, P). Qazi started paying the difference to Kalicharan in cash, (Qazi Dep. 172-73), and Kalicharan approved payment of the invoices.

7

Kalicharan left Nebraskaland in October 2009 in a dispute over some missing and possibly stolen chicken. (Romanoff Dep. 87-89). The company then discovered that he had been receiving the per-gallon discount in cash and conducted an investigation to determine how much money was missing.[4] (Romanoff Dep. 505-12). Shortly thereafter, Romanoff contacted Wright Express and Sunoco in an ultimately fruitless effort to recover the missing funds. (Wolter Decl. Ex. B). This lawsuit followed.

## DISCUSSION

Nebraskaland does not claim that it directly negotiated a contract with Sunoco. Rather, Nebraskaland claims that Qazi – and, especially, Finkelstein – acted within the scope of their actual and apparent authority as Sunoco's agents when agreeing to the per-gallon discount. Accordingly, Nebraskaland claims, Sunoco is either bound to the contract itself or responsible for the losses caused by the intentional torts of its agents – in either case, Nebraskaland would have recourse against Sunoco.

We begin with the basic principles:

> Agency is a legal relationship between a principal and an agent. It is a fiduciary relationship which results from the manifestation of consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act. The agent is a party who acts on behalf of the principal with the latter's express, implied, or apparent authority.

Faith Assembly v. Titledge of N.Y. Abstract, LLC, 106 A.D.3d 47, 58 (N.Y. App. Div. 2013) (quoting Maurillo v. Park Slope U-Haul, 194 A.D.2d 142, 146 (N.Y. App. Div. 1993)). When an agent acts on behalf of the principal, then the "'principal must answer to an innocent third person

---

[4] It is not entirely clear how much money is missing. One of Nebraskaland's audits reached an approximate figure of $582,000, calculated by subtracting the actual SunTrak invoice deductions from what would have been the amount of the deduction had the per-gallon discount had been correctly applied, then multiplying the difference by the total gallons purchased at the Garrison station. (Romanoff Dep. 512-13).

8

for the misconduct of an agent acting within the scope of its authority.'" Id. (quoting Tucci v. Hartford Cas. Ins. Co., 167 A.D.2d 387, 388 (N.Y. App. Div. 1990)). In other words, if Finkelstein and Qazi acted with Sunoco's authority – actual or apparent – when negotiating or administering the per-gallon discount, then Sunoco is answerable for their alleged scheme to steal the money owed Nebraskaland.

**A. Actual Authority**

Actual authority is most clearly established by direct communications from the principal to the agent – usually contractual provisions – that specifically assign powers to the agent to be exercised on the principal's behalf and subject to its control. See generally Restatement (Third) of Agency § 2.01 (2006). As the Second Circuit has explained:

> Actual authority "is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all circumstances attending these manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware."

Peltz v. SHB Commodities, Inc., 115 F.3d 1082, 1088 (2d Cir. 1997) (quoting Demarco v. Edens, 390 F.2d 836, 844 (2d Cir. 1968)).

The general rule holds that a franchisee is not the agent of a franchisor. See Terrano v. Fine, 17 A.D.3d 449 (N.Y. App. Div. 2005). That rule makes sense because the typical franchise agreement disclaims any agency relationship, instead establishing the franchise as an independent business, operating at the franchisee's direction and for its own benefit. However, the existence and scope of an agency relationship often depends not solely on the express communications and agreements between the parties, but on the degree of control in fact exercised by the alleged principal. See In re Nigeria Charter Flights Contract Litigation, 520 F. Supp. 2d 447, 461 (E.D.N.Y. 2007). Thus, despite the general rule, the courts will hold the

9

franchisor accountable for the acts of its franchisee if the franchisor exercised such complete control over the day-to-day operations of the franchisee's business that its purported independence may be fairly dismissed as a fiction. See, e.g., Wu v. Dunkin' Donuts, Inc., 105 F. Supp. 2d 83, 87 (E.D.N.Y. 2000) (citing Schoenwandt v. Jamfro Corp., 261 A.D.2d 117 (N.Y. App. Div. 1999)). Similarly, the courts will impose liability on the franchisor if it exercised ultimate control over the instrumentality that caused harm to an injured third-party (the so-called instrumentality test). See Id.; Abreu v. Getty Ref. and Mktg. Co., Inc., 121 A.D.2d 419, 419 (N.Y. App. Div. 1986).

We first look to the scope of authority expressly conferred by the DSFA. That agreement establishes the Garrison station as an independent business, and vests Finkelstein/BBZZ with the exclusive right to set fuel prices. The DSFA grants Finkelstein/BBZZ no authority to bind Sunoco to those prices, and instead disclaims any agency relationship between the two. No extrinsic evidence contradicts those provisions.[5] Accordingly, Finkelstein and Qazi possessed no express authority to bind Sunoco to the Garrison station's individually negotiated per-gallon discounts. Nebraskaland contests that point by reminding the Court of its decision in Nigeria Charter, in which the Court explained that "'where the circumstances raise the possibility of a principal-agent relationship, and no written authority for the agency is established, questions as to the existence and scope of the agency must be submitted to the jury.'" 520 F. Supp. 2d at 461 (quoting Time Warner City Cable v. Adelphi Univ., 27 A.D.3d 551, 553 (N.Y. App. Div. 2006)).

---

[5] Contrary to Nebraskaland's reading of his testimony, Sunoco's employee, John Mattix, did not state that franchisees are authorized to bind Sunoco to their individual per-gallon discounts. Rather, Mattix simply confirmed that the franchisees, who wield exclusive authority to set their own retail pump prices under the DSFA, necessarily possess the authority to bind themselves, not Sunoco, to any negotiated discounts applied to those pump prices. Nor could a reasonable fact-finder infer that Sunoco consented to be bound simply because Sunoco created the SunTrak program. Its franchisees could not possibly have done so on their own.

That appeal overlooks a key difference in context: in <u>Nigeria Charter</u>, the Charter Agreement was silent on the question of whether the ticketing agent could directly bind the airline to charter flights sold to individual consumers. In contrast, although Nebraskaland can complain that the DSFA is not specific (for example, it does not reference the SunTrak program by name), it is not silent on the question of Finkelstein's agency.

The Court next turns to the question of whether Sunoco's general control over the Garrison station or specific control over the instrumentality that caused Nebraskaland's losses establishes an agency relationship despite the DSFA's disclaimer, thus exposing Sunoco to potential liability. Pursuant to the DSFA, Sunoco does retain control over certain aspects of the Garrison station's operations. However, Sunoco does not retain the thorough degree of day-to-day control required to establish that Finkelstein and Qazi acted as Sunoco's agents, rather than as independent franchisees. Nor does extrinsic evidence demonstrate that Qazi and Finkelstein, despite the provision of the DSFA, in fact acted under Sunoco's day-to-day control when operating the Garrison station. On the contrary, Sunoco exercised almost no control beyond the limited authority reserved to it under the DSFA. Therefore, even viewing the evidence in the light most favorable to Nebraskaland, there is no genuine dispute of material fact on the question

of whether Sunoco's exercise of day-to-day control over the Garrison station was so total that Sunoco may be held liable for its alleged agents' misconduct.[6]

Similarly, Sunoco did not exercise control over the instrumentality that caused injury to Nebraskaland. Preliminarily, the Court notes that the instrumentality test is typically applied in the context of personal injury liability, in which the identity of the instrumentality or instrumentalities is fairly clear. See, e.g., Abreu, 121 A.D.2d at 419-420 (plaintiff struck by vehicle). In contrast, when applied to intentional conduct, the threshold question of what "instrumentality" caused the harm is more ephemeral, and can be somewhat vexing. This case illustrates the problem. Sunoco identifies at least two possible instrumentalities: Finkelstein and Qazi's alleged abuse of the SunTrak invoicing process, or the pricing of fuel. In either case, says Sunoco, it exercised no control. Nebraskaland contends that the instrumentalities are, generally, the SunTrak Merchant Discount Form and SunTrak program, or the franchisee practice of offering their own per-gallon discounts.

Both parties' formulations are a bit too broad. The instrumentalities here are not the invoicing process, nor the pricing of fuel, nor the general practice by which Sunoco permitted its franchisees to offer individual fleet and per-gallon discounts (though, as will be seen, that practice is quite relevant to the question of apparent authority). Rather, the instrumentalities that

---

[6] Nebraskaland directs the Court's attention to the Southern District's decision in Toppel v. Marriott Int'l, Inc., 2008 WL 2854302 (S.D.N.Y. 2008), a slip-and-fall case in which the court reached the opposite conclusion, reasoning that the control exercised by Marriott International, Inc. over its Bahamian franchisee pursuant to their franchise agreement created a genuine issue of material fact on the issue of vicarious liability. As Nebraskaland correctly points out, there is some overlap between the Marriott franchise agreement at issue in Toppel and the DSFA between Sunoco and Finkelstein. However, the Marriott franchise agreement – particularly its incorporation of the so-called Hotel Design Guide and SOP Manual – imposed much more sweeping and detailed demands on Marriot's franchisees than anything the DSFA imposes on Sunoco's franchisees. Id. at *6-7. Accordingly, the Court is not persuaded by Nebraskaland's reliance on Toppel.

12

injured Nebraskaland are the individual Merchant Discount Forms by which Finkelstein and Qazi reduced the amount of the SunTrak invoice deduction, coupled with Kalicharan's ability to conceal the invoices. Finkelstein and Qazi prepared those Forms, not Sunoco. And Nebraskaland has not pointed to evidence supporting the reasonable inference that Sunoco, rather than Citibank, actually processed those Forms or, more generally, exercised direct supervision over the invoicing process during the relevant time frame.[7] On the contrary, as the terms of the Private Label Card Agreement make clear, Citibank processed the Merchant Discount Forms and issued the SunTrak statements. Finally, Sunoco was plainly in no position to exercise control over Kalicharan.

## B. Apparent Authority

When we inquire into an agent's actual authority, we focus on the interactions between the purported principal and its agent, not on what an injured third-party believed to be the scope of the agent's authority. But with apparent authority, the injured third-party's beliefs are critical.

There are key limitations, however. First, a third-party may not rely solely on the conduct or representations of the apparent agent – the principal must by its own conduct cloak the agent with the appearance of authority that the agent does not in fact possess. See, e.g., Standard Funding Corp. v. Lewitt, 89 N.Y.2d 546, 551 (N.Y. 1997). "Apparent authority will only be found where words or conduct of the principal—not the agent—are communicated to a

---

[7] Nebraskaland also argues that that Sunoco "funded" the per-gallon discount – specifically, that Sunoco would pay Citibank the value of the per-gallon discount and then recover that payment from Finkelstein. That argument relies on the presupposition that the instrumentality at issue is the SunTrak program itself, or perhaps the ebb and flow of money among the parties. Again, this approach defines "instrumentality" too broadly. Even assuming that Sunoco funded the discount in this manner, that fact does not permit a reasonable fact-finder to infer that Sunoco controlled the Merchant Discount Forms prepared by Finkelstein and Qazi, or that Sunoco, rather than Citibank, managed the actual invoicing procedures. Nor would Sunoco's funding of the discount manifest consent by Sunoco to back each individual discount.

third party, which give rise to a reasonable belief and appearance that the agent possesses authority to enter into the specific transaction at issue . . . an 'agent cannot by his own acts imbue himself with the apparent authority' to act for a principal." Edinburg Volunteer Fire Co., Inc. v. Danko Emergency Equipment Co., 55 A.D.3d 1108, 1110 (N.Y. App Div. 2008) (quoting Hallock v. State of New York, 64 N.Y.2d 224, 231 (N.Y. 1984)).

Although a franchisor will frequently supply its franchisees with signage and advertising materials marked with the franchisor's logo, the franchisee's mere use of those materials will not support a finding of apparent authority. Cf. Norton v. Cohen, 248 A.D.2d 519, 520 (N.Y. App. Div. 1998) (explaining that franchisee's use of signage is insufficient to impose a duty of care on franchisor); Dinaco, Inc. v. Time Warner, Inc., 346 F.3d 64, 69 (2d Cir. 2003) ("If advertising is the stuff of agency then every advertisement by a franchisee with the franchisor's mark would confirm an agency."); See also In re Motor Fuel Temperature Sales Practices Litig., 2012 WL 1536161, at *7-8 (D. Kan., April 30, 2012) (applying Kansas law and holding that franchisee's use of franchisor's signage and trademarks did not support finding that franchisee sold fuel as agent of franchisor).

However, as the Second Circuit's decision in Herbert Constr. Co. v. Continental Ins. Co., 931 F.2d 989 (2d Cir. 1991) demonstrates, the purported agent's use of such materials, supplied by the principal, in the course of forming a contract with a third-party may create a genuine issue of fact on the issue of apparent authority. In Herbert, an agent of an insurance company executed a performance bond with a construction company on the insurer's behalf despite the fact that the insurer had revoked his actual authority to do so. Id. at 991. But, when executing the bond, the agent had allegedly used blank power of attorney forms, corporate insignia, and blank bond forms with the logo of the insurer. Id. The Second Circuit reversed the district

14

court's grant of summary judgment in favor of the construction company while affirming its denial of summary judgment to the insurer, ruling that the issue of apparent authority would have to be submitted to the jury. Id. at 994, 998.

A second key limitation on a claim of apparent authority is that the injured third-party must have relied on misleading representations or conduct that took place at or before the time of contracting. Dinaco, 346 F.3d at 70.

Finally, the injured third party's reliance must be objectively reasonable. Fitzgibbon v. Abatelli Real Estate, 214 A.D.2d 642, 644 (N.Y. App. Div. 1995) (quoting Hallock, 64 N.Y.2d at 231) ("A third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable[.]"). Indeed, where the purported agent's apparent authority seems sufficiently dubious, the law imposes a duty of inquiry on those who seek to rely on that authority. Id. ("'One who deals with an agent does so at his [or her] peril, and must make the necessary effort to discover the actual scope of authority.'" (quoting Ford v. Unity Hosp., 32 N.Y.2d 464, 472 (1973)) (alterations in original)); See also William Penn Life Ins. Co. of New York v. Irving Trust Co., 145 A.D.2d 174, 175 (App. Div. 1989) ("[P]rudence, if nothing else, dictates that when an agent's authority to enter into a particular transaction is less than certain, an inquiry be made of the principal to confirm the actual scope of the agent's authority").

In the Court's view, Nebraskaland's only viable theory of recovery sounds in apparent authority, and hinges entirely on the perceptions – or rather, misperceptions – of its president, Romanoff, at the March 2006 meeting and upon receiving the SunTrak Merchant Discount Form immediately thereafter. Romanoff has explained his view as follows:

> I knew that Finkelstein and Qazi operated the Sunoco-branded Garrison Station, which displayed various Sunoco signs, logos, and products. In addition,

15

> Finkelstein and Qazi had provided us with the Sunoco SunTrak promotional materials, had facilitated Nebraskaland's receipt of the Sunoco SunTrak credit cards, had arranged for the SunTrak 3% discount, which was shown on the Sunoco Invoices, and had confirmed the Per Gallon Discount by means of the SunTrak Merchant Discount Form. Accordingly, I understood that Finkelstein and Qazi had been and were continuing to act on behalf of Sunoco and that this Per Gallon Discount, too, was being agreed to by Sunoco.

(Romanoff Aff. 3).

Thus, in viewing the 2006 meeting from Romanoff's perspective, we must bear in mind his previous experience with the fleet discount and the SunTrak program, because these lay the foundation for Nebraskaland's theory that a reasonable fact-finder could conclude that Finkelstein and Qazi acted with apparent authority to bind Sunoco to the per-gallon discount.

Nebraskaland had joined the SunTrak fleet program in late 2005 or early 2006. The exact date is not critical. What matters is that Nebraskaland was a participant in SunTrak before the March 2006 meeting between Qazi, Finkelstein, Kalicharan and Romanoff.

Finkelstein and Qazi had been Nebraskaland's direct points of contact with Sunoco when it entered into the SunTrak program. They did not, strictly speaking, have the authority to bind Sunoco to the fleet discount – Citibank owned the credit facility and had the ability to establish credit limits or refuse to issue a SunTrak card entirely. Nevertheless, the fleet discount had all the outward appearances of a program owned or at least backed by Sunoco, and is even referred to throughout the record as the "Sunoco" discount, to distinguish it from the individual dealer-backed per-gallon discounts. Thus Finkelstein and Qazi, who also bore Sunoco's own sales literature, essentially acted on Sunoco's behalf when arranging Nebraskaland's initial participation in SunTrak. They pitched the program, Nebraskaland agreed, and, shortly thereafter, Nebraskaland started receiving the 3% fleet discount directly off invoices ostensibly coming from and payable to Sunoco. So far, so good – neither Romanoff nor Nebraskaland itself

was plainly unreasonable in concluding that: (1) SunTrak belonged to Sunoco itself, not Citibank; and (2) Finkelstein and Qazi acted as Sunoco's agents when enlisting customers for the SunTrak fleet discount.

Within two months, at most, the same two apparent agents approached Nebraskaland to offer the per-gallon discount. The terms of that discount are, of course, quite different. Most importantly, the discount is limited to the Garrison station. Standing alone, that condition strongly suggests an agreement solely between the Garrison station and Nebraskaland, not Sunoco and Nebraskaland. Accordingly, if Finkelstein and Qazi had not already facilitated Nebraskaland's entry into the SunTrak program and its receipt of the fleet discount before approaching Nebraskaland with the per-gallon discount, the results of this motion might well be different. But Finkelstein and Qazi had already apparently negotiated the fleet discount on Sunoco's behalf, and here they were a second time, soon after that transaction, again bearing Sunoco promotional material, offering Romanoff another discount to be administered through the same credit facility, which was then memorialized in writing (in Romanoff's view) on the SunTrak Merchant Discount Form.[8] Moreover, the Merchant Discount Form states that the discount was "authorized by" Finkelstein, which raises the question of who it was authorized <u>for</u>. Sunoco's logo, placed squarely at the top of the page, suggests an answer – an incorrect answer,

---

[8] Sunoco, citing Dinaco, asserts that the Merchant Discount Form should not factor into the analysis, because the supposedly misleading conduct of the principal must take place at or before the time of contracting, and Nebraskaland did not receive the Form until after the meeting. However, Romanoff has explained that the Merchant Discount Form was not something he received only after concluding a verbal contract – in Romanoff's eyes, the merchant discount form <u>was</u> the contract, a written instrument that memorialized the agreement with Finkelstein, Qazi, and (so Romanoff believed) Sunoco. That belief might seem dubious to lawyers viewing the document after the fact. But in light of the fact that the Merchant Discount Form is dated March 20, 2006 (just after the meeting), Romanoff's belief that it was intended to reflect the terms of the agreement is not so absurd that the Court can reject it on a motion for summary judgment.

17

as it turns out, but not obviously incorrect. In addition, there is some indication that Finkelstein, thus cloaked by Sunoco with apparent authority, expressly told Romanoff that "Sunoco" would reimburse Nebraskaland.

In these circumstances, the Court cannot conclude that Nebraskaland did not change its position in reliance on the mistaken belief that, through its apparent agents, Sunoco had agreed to reimburse the per-gallon discount. Nor can we hold that Sunoco's provision of promotional materials to those apparent agents and previous use of these agents to facilitate Nebraskaland's SunTrak account did not foster that mistaken belief.

This brings the Court to the question of whether it was reasonable for Nebraskaland – Romanoff, in effect – to construe matters this way. Sunoco expresses incredulity, and not without good reason. Is it truly reasonable for a sophisticated commercial party to rely on such slender reeds? That question is not an easy one, and if the Court were the fact-finder, it might well answer in the negative. But the Court is not the fact-finder on a motion for summary judgment, and concludes that Romanoff's commercial sophistication is itself too slender a reed to support the conclusion that Nebraskaland's professed reliance was unreasonable as a matter of law.

Sunoco also argues that it is almost inconceivable that it would agree to be bound by the terms of one individual contract between a single dealer and a single truck fleet out of the many thousands of such contracts. As an abstract proposition, this seems persuasive. But the record here indicates that it might not have been unreasonable for Nebraskaland to conclude that the value of its business made it a special case. Nebraskaland is among the largest meat distributors in the area, a "top 50" Sunoco fleet account. (Wolter Decl. Ex. B, at 3). When the per-gallon

discount fraud was uncovered, Sunoco (through Mattix) instructed Finkelstein to "do whatever you have to do" to get the account back. (Finkelstein Dep. 146).

In short, Romanoff held multiple mistaken impressions that, in tandem, created the overarching misimpression that Sunoco would reimburse his company. His impressions are open to vigorous challenge – and if a jury should find that these impressions were unreasonable, or that he should have undertaken further inquiry, Nebraskaland will have no recovery on its theory of apparent agency. Cf. Marathon Enterprises, Inc. v. Schroter GmbH & Co. KG, 95 F. App'x 364, 367-68 (2d Cir. 2004) (affirming district court's charge to jury on reasonable reliance and refusal to charge actual authority). But Romanoff's beliefs cannot be disposed of as presumptively unreasonable on summary judgment.

In conclusion, Nebraskaland has – albeit barely – marshaled sufficient facts to survive Sunoco's motion. Summary judgment is therefore denied.

SO ORDERED.

Dated: Brooklyn, New York
October 8, 2013

s/Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge